**Nelson K. DOI, in his capacity as Lieutenant Governor of the State of Hawaii, Rudolph B. Legaspi, in his capacity as County Clerk of Hawaii, Eileen K. Lota, in her capacity as City Clerk for the City and County of Honolulu, Tad T. Miura, in his capacity as County Clerk of Kauai, and James Ushijima, in his capacity as County Clerk of Maui, Plaintiffs,**

v.

**Griffin B. BELL, in his capacity as Attorney General for the United States of America, and Manuel D. Plotkin, in his capacity as Director, Bureau of the Census, Department of Commerce of the United States of America, Defendants.**

Civ. No. 77–0256.

United States District Court,
D. Hawaii.

March 28, 1978.

268

Randall Y. Iwase, Deputy Atty. Gen., Ronald Y. Amemiya, Atty. Gen., State of Hawaii, Honolulu, Hawaii, for plaintiffs.

S. Michael Scadron, Atty., Civil Rights Div., Drew S. Days, III, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Harold M. Fong, U. S. Atty., D. Hawaii, Honolulu, Hawaii, for defendants.

## DECISION AND ORDER DENYING MOTION FOR FURTHER SUMMARY JUDGMENT

SAMUEL P. KING, Chief Judge.

Plaintiffs'[1] motion for summary judgment presents questions as to the interpretation of the bilingual election requirements of Section 203 of the Voting Rights Act.[2]

These requirements were added to the Voting Rights Act of 1965[3] by the Voting Rights Act Amendment of 1975.[4] The new section mandates the use of the language[5] of a language minority group as well as the English language in the electoral process[6] of any State or political subdivision covered by the provision. The section limits the meaning of language minority and language minority group to encompass only persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage.[7]

The section is not self-operating. Coverage is triggered if the Director of the Census determines (i) that more than 5% of the citizens of voting age of a State or political subdivision are members of a single language minority[8] and (ii) that the illiteracy rate of such persons as a group is higher than the national illiteracy rate. Illiteracy for this purpose is defined as the failure to complete the fifth primary grade.[9] The determinations of the Director of the Census become effective upon publication in the Federal Register and are not subject to review in any court.

The September 18, 1975, issue of the Federal Register carried determinations by the Director of the Census that certain political subdivisions met the requirements for coverage under Section 203 with respect to certain language minority groups as list-

1. The action was brought and is still being litigated in the names of the State and County election officials against the Attorney General of the United States and the Director of the Census. I have treated the action as one filed in the names of the State of Hawaii and its political subdivisions against the United States.

2. 42 U.S.C. § 1973aa–1a (Supp. V 1975).

3. Pub.L. 89–110, 79 Stat. 437 (1965) (amended 1968, 1970 & 1975).

4. Pub.L. 94–73, § 301, 89 Stat. 400 (1975).

5. "A jurisdiction with a minority group whose language is oral is, of course, required only to provide oral assistance. And, obviously, a jurisdiction is not required to provide materials or assistance in an extinct language." S.Rep.No. 295, 94th Cong., 1st Sess. 39, *reprinted in* [1975] U.S.Code Cong. & Admin.News, pp. 774, 806.

6. The section refers to the provision of any "registration or voting notices, forms, instructions, assistance, or other materials or informa-

tion relating to the electoral process, including ballots." 42 U.S.C. § 1973aa–1a(b) & (c) (Supp. V 1975).

7. These specific language minorities were singled out because documentation of discrimination and non-responsiveness by the states was substantial as to these groups, especially as to persons of Spanish heritage. S.Rep.No. 295, *supra* note 5, at 30–32, 38–39, [1975] U.S.Code Cong. & Admin.News at 796–98, 804–06.

8. The prohibitions of section 203(b) do not apply in any political subdivision of a State which has less than 5% voting age citizens of the language minority although the State as a whole may have more than 5% voting age citizens of that language minority. 42 U.S.C. § 1973aa–1a(b) (Supp. V 1975).

9. In any language in any country and including equivalent formal education. *See* P. Kawaguchi, An Update of the Application of the Federal Voting Rights Act to the Hawaii Electorate 3 (Res. & Stat. Office, Hawaii Dept. Health, Population Rep. No. 8, Mar. 1977).

ed.[10] Hawaii headed the list with the following determinations:

| State or political subdivision:[11] | Specified language minority[12] |
|---|---|
| Hawaii (Statewide) | Chinese, Filipino |
| Hawaii County | Filipino, Japanese |
| Honolulu County[13] | Chinese, Filipino |
| Kauai County | Filipino, Japanese |
| Maui County | Do. |

The publication gives no illiteracy rates, but footnotes the heading "Specified language minority" with the explanation: "Generally jurisdictions in which more than 5 percent of the citizen population of voting age are members of a language minority and the illiteracy rate is greater than the national rate." In fact, the Director of the Census calculated the national illiteracy rate for the purposes of Section 203(b) at 4.6%.[14] The published determinations were based on this rate. The comparable illiteracy rates for the specified language minorities do not appear in the record now before me.

There is some evidence that the State of Hawaii received the news that it might have to conduct its elections for the next 10 years in four languages with less than joy.[15] The Director's determinations were founded on data from the 1970 Decennial Census.

Hawaii's election officials were of the opinion that current data would lead to different results.[16] The Amendment itself grants an avenue for relief. Section 203(d) provides:

> (d) Any State or political subdivision subject to the prohibition of subsection (b) of this section, which seeks to provide English-only registration or voting materials or information, including ballots, may file an action against the United States in the United States District Court for a declaratory judgment permitting such provision. The court shall grant the requested relief if it determines that the illiteracy rate of the applicable language minority group within the State or political subdivision is equal to or less than the national illiteracy rate.[17]

This suit was filed on July 14, 1977, pursuant to this statutory bail-out authorization. The United States filed its answer on October 21, 1977. Motion for summary judgment was filed by plaintiffs on February 8, 1978, and argued on March 23, 1978.

In support of the motion for summary judgment, plaintiffs presented a population

10. 40 Fed.Reg. 43044–45 (1975). There were eleven States affected by this determination.

11. In Hawaii all elections are conducted by the county clerks under the general supervision of the Lieutenant Governor. There are four counties that are political subdivisions of the State for election purposes. The United States in its response to plaintiffs' motion for summary judgment came to the conclusion that section 203 does not encompass statewide coverage for any jurisdiction, that no perceivable obligation attaches to the State of Hawaii as a result of such coverage separate from the obligations of each covered county, and that declaratory relief would make sense only as to each covered county and would not appear necessary as to the State. Memorandum Responding to Plaintiffs' Motion for Summary Judgment, at 5 n. 6. The State does not agree with this analysis for the reason that the Lieutenant Governor does "provide registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots," as set out in section 203(b) and (c).

12. The act does not define the term Asian American. The legislative history indicates that the Bureau of the Census is to count only persons who are identified as Korean, Chinese,

Japanese, and Filipino. In order to determine whether a jurisdiction has more than 5% Asian American citizens of voting age, the Director of the Census does not aggregate the four Asian American sub-groups. Opinion letter from J. Stanley Pottinger, Assistant Attorney General, Civil Rights Division, Department of Justice, to Vincent P. Barabba, Director of the Bureau of the Census (Aug. 5, 1975) (part of exhibit B to Plaintiffs' Motion for Summary Judgment) (a copy accompanying form letter to interested State and County officials).

13. Technically the City and County of Honolulu.

14. Opinion letter from J. Stanley Pottinger, *supra* note 12, at 2. The Senate and House Reports on the Voting Rights Act Amendment of 1975 give a 1970 national illiteracy rate of 5.5%. This was based on illiteracy of persons 25 years or older. Since 1971, citizens of voting age include persons 18 years or older, which produces a lower rate.

15. P. Kawaguchi, *supra* note 9, at 7.

16. *Id.* at 1.

17. 42 U.S.C. § 1973aa–1a(d).

report published by the Research and Statistics Office of the Hawaii Department of Health entitled "Population Survey 1976 AN UPDATE OF THE APPLICATION OF THE FEDERAL VOTING RIGHTS ACT TO THE HAWAII ELECTORATE."[18] While they were at it, however, the Department of Health added another dimension to the survey.[19] To quote from the report:

The Voting Rights Act assumed that persons with less than 5 years of education could not understand or read English and, thus, would need some type of bilingual assistance. Because many persons may have learned English through other than a regular school, it was felt that educational attainment was not a very good measure of language need. Therefore, an adjustment was made to the number of persons with less than 5 years of education. Each person was asked several questions so that their proficiency in the use of the English language might be assessed. The two questions used to adjust the illiteracy rate were "Do you understand spoken English?" and "Can you read English?" Persons who had less than 5 years of education and who answered, "Yes, easily," to both of these questions were counted as being literate.[20]

Thus, the survey reported two illiteracy rates for each relevant language minority, one based solely on the statutory definition set out in Section 203(b), and one adjusted to exclude those who said they could easily understand spoken English and easily read English. The results[21] were as follows:

| Political subdivision | Specified language minority | Updated rate | Adjusted rate |
|---|---|---|---|
| Hawaii (statewide) | Filipino | 9.1 | 5.6 |
| | Chinese | 3.8 | 3.1 |
| Hawaii County | Filipino | 12.9 | 7.3 |
| | Japanese | 4.1 | 1.8 |
| Honolulu County | Filipino | 7.5 | 4.9 |
| | Chinese | 3.9 | 3.2 |
| Kauai County | Filipino | 14.9 | 6.8 |
| | Japanese | 3.7 | 1.5 |
| Maui County | Filipino | 12.6 | 8.5 |
| | Japanese | 3.1 | 2.4 |

Plaintiffs proceeded on the assumption that the national illiteracy rate for the purpose of bailing out under Section 203(d) would be the same as the national illiteracy rate used as a basis for triggering coverage under Section 203(b), that is, 4.6%. Accordingly, they conceded continued coverage with respect to the Filipino language minority statewide and in each county but claimed entitlement to relief as to further coverage with respect to the Chinese and Japanese language minorities.

The United States answered by conceding the validity of the 1976 survey's updated

18. P. Kawaguchi, *supra* note 9.

19. "[T]he survey was designed to be as comparable to that of the 1970 census as possible. A systematic random sample of 5.5 percent of the total number of households in the state was selected. The questions on educational attainment and ethnicity were asked in a manner similar to that used during the 1970 census. The questions and categories of answers were taken from the 1970 census questionnaire and reproduced on cards. These cards were shown to the persons responding, who would read the questions and then select an answer from the list provided.

"There was one important difference between the procedure followed in the 1970 census and the procedure followed in the population survey. The question on ethnicity in the 1970 census was designed so that people could identify themselves as to their color or race. This method presented a problem for persons of mixed ethnicity. In many cases, these persons would select the 'other' category, in which case the interviewer would write on the line provid-

ed the different enthnicities of the person. The Census Bureau would then distribute these persons of mixed ethnicities into ethnically 'pure' categories. However, in the population survey, persons who elected the category 'other' for their ethnicity were left in this category.

"Since this report is about Hawaii's electorate, only those persons who were 18 years of age or who would be 18 years of age by 2 November 1976, general election day, and who were citizens of the United States are included in this analysis.

"Also, because the Director of the Census had determined that Japanese, Filipinos, and Chinese constitute the only groups covered in Hawaii by the Voting Rights Act, this report will focus on these three ethnic groups." *Id.* at 1–2. (footnotes omitted).

20. *Id.* at 3.

21. *Id.* Table 15; Memorandum Supporting Plaintiffs' Motion for Summary Judgment, at 5.

illiteracy rates.[22] It alleged, on the other hand, that the comparable updated national illiteracy rate was 3.4%,[23] and argued that this was the correct rate against which to compare the survey's updated rates.[24]

Under either approach, the parties agreed that Maui County was entitled to the relief requested with regard to its Japanese language minority. A stipulation for partial summary judgment was entered on January 9, 1978, declaring that the requirements of Section 203 should not continue to apply as to the Japanese language minority group within Maui County.

The plaintiffs now argue that they are entitled to bail out as to the other Chinese and Japanese language minorities against a national illiteracy rate of 4.6% or, if not, then in reliance upon their adjusted illiteracy rates. The United States responds that 3.4% is the appropriate national illiteracy rate, that the statute does not permit an adjusted illiteracy rate, or that if it does this should require an evidentiary hearing as to the scientific standards of reliability and validity for the proposed adjustment, and that any adjusted illiteracy rate of a language minority should be compared to a similarly adjusted national illiteracy rate.

I agree with the positions taken by the United States.

▪ Nothing in Section 203(b) limits the Director of the Census to one determination triggering coverage based only on data from the 1970 Decennial Census. As I read the statute, he may update his own data and publish further determinations from time to time. Suppose that this motion were being heard in 1981 and that the State's survey and the next Decennial Census had been held in 1980 with the same results, that is, with an updated national illiteracy rate of 3.4% and an updated Hawaii County Japanese language minority illiteracy rate of 4.1%. Under plaintiffs'

argument, Hawaii County would be entitled to bail out under Section 203(d) against the original triggering national illiteracy rate of 4.6%, but the Director of the Census could immediately retrigger coverage under Section 203(b) by applying the new national illiteracy rate of 3.4%.

▪ The fact that the next Decennial Census has not yet been held does not prevent the Director of the Census from updating the national illiteracy rate for purposes of further determinations under Section 203(b). The best that plaintiffs can expect from Section 203(d) is an opportunity for an evidentiary hearing as to the national illiteracy rate against which to compare the illiteracy rate of the applicable language minority group. In an adversary proceeding, the Director of the Census may find bases for revising his "best estimate" of the 1976 national illiteracy rate.[25] This is not the kind of material from which summary judgments are fashioned.

▪ Use of an adjusted illiteracy rate raises more evidentiary problems. As pointed out in the response of the United States,[26] plaintiffs have not demonstrated on this record that the method for determining the adjusted illiteracy rates meets accepted scientific standards of reliability and validity. Also the record does not demonstrate that the adjusted rates are equal to or less than a comparable national rate. If it makes sense to adjust the definition of illiteracy with respect to a language minority group, why not also with respect to the nation as a whole? Here again, the best that plaintiffs can expect is an evidentiary hearing on these questions. And again, this makes summary judgment inappropriate.

▪ There are good reasons why arbitrary definitions such as the definition of illiteracy in Section 203(b) should not be abandoned too readily for purposes of Sec-

22. Answer, paras. 4–5; Memorandum Responding to Plaintiffs' Motion for Summary Judgment, App. C.

23. Answer, para. 2.

24. Memorandum Responding to Plaintiffs' Motion for Summary Judgment, at 9–16.

25. *Id.* App. C.

26. *Id.* at 16–18.

tion 203(d). The history of attempts to guarantee the right of every citizen to vote demonstrates man's ingenuity in seizing upon every possible technicality to circumvent the Congressional intent.[27] Section 203 must be viewed as a part of the Voting Rights Act of 1965. It imposes less stringent requirements than Section 4 of the Voting Rights Act, which now adds English-only in the electoral process as a test or device used to deny or abridge the right to vote on account of race or color under certain circumstances. The findings set out in Section 4(f)(1)[28] reinforce the findings set out in Section 203(a).[29]

Plaintiffs' recital of absurdities and impracticalities relates to the reasonableness of the triggering procedure and does not enlarge their duties under the Act. The Department of Justice has published Interpretive Guidelines for Implementation of the Provisions of the Voting Rights Act Regarding Language Minority Groups.[30] One of the guidelines permits targeting, which refers to a system in which the minority language materials or assistance required by the Act are provided to less than all persons or registered voters.[31] The Attorney General takes the view that a targeting system will normally fulfill the Act's minority language requirements if it is designed and implemented in such a way that language minority group members who need minority language materials and assistance receive them.[32] The 1976 survey by the Hawaii Department of Health could be an effective tool for targeting.[33]

In argument, plaintiffs reminded the court that Section 203 must be interpreted and applied in such a way as not to run afoul of the Constitutional limitations on the Federal authority to interfere in the conduct of State elections, citing *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).[34] Congress considered this issue and concluded these bilingual election provisions were clearly within the enforcement powers of Congress under the Fourteenth and Fifteenth Amendments.[35] The issue was not briefed by the parties so I do not believe I am called upon to render an opinion in this area at this time.

---

27. *See* S.Rep.No. 295, *supra* note 5.

28. "The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens are from environments in which the dominant language is other than English. In addition they have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country, this exclusion is aggravated by acts of physical, economic, and political intimidation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices." 42 U.S.C. § 1973b(f)(1) (Supp. V 1975).

29. "The Congress finds that, through the use of various practices and procedures, citizens of language minorities have been effectively excluded from participation in the electoral process. Among other factors, the denial of the right to vote of such minority group citizens is ordinarily directly related to the unequal educational opportunities afforded them, resulting in high illiteracy and low voting participation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting these practices, and by prescribing other remedial devices." 42 U.S.C. § 1973aa–1a(a) (Supp. V 1975).

30. 41 Fed.Reg. 29998–30003 (1976).

31. 41 Fed.Reg. 3000 (1976) (to be codified in 28 C.F.R. § 55.17).

32. *Id.*

33. Memorandum Responding to Plaintiffs' Motion for Summary Judgment, at 18–19.

34. The Supreme Court, while upholding the lowering of the voting age for national elections, held that the prohibition was invalid for state and local elections. Subsequently, the 26th Amendment to the Constitution accomplished the end which Congress had sought to achieve.

35. S.Rep.No. 295, *supra* note 5, at 39, [1975] U.S.Code Cong. & Admin.News at 806.

For the foregoing reasons, the Motion for Summary Judgment, except as to the partial summary judgment heretofore granted with respect to Maui County, is DENIED.